**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KRISTIN MEYER, TAMARA WAGNER, STEPHANIE MORGAN, JAMES NESS, CHRISTY TRENT, RON GLICK, RHONDA SALINAS, CHRISTINA MCRAE, NICOLE NOBLET, GERARD ROGERS, KATHRYN FITZPATRICK, NICHOLE MARTIN, JAKOB NASAKAITIS, KIM KOVARIKOVA, BERNARDO VALDES, CHARLOTTE ROMAN, STANLEY JESSEPH, and SOUTH CAROLINA CONVENIENCE & PETROLEUM MARKETERS ASSOCIATION
1809 Gadsden Street, Columbia, SC 29201 (physical)
PO Box 64, Columbia, SC 29202 (mailing)

Plaintiffs,

-*against*-

BROOKE ROLLINS, in her official capacity as Secretary of Agriculture, and

UNITED STATES DEPARTMENT OF AGRICULTURE

Defendants.

Case No. ________________

**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## PRELIMINARY STATEMENT

1. This action, brought on behalf of two classes of SNAP recipients and the South Carolina Convenience & Petroleum Marketers Association ("SCCPMA"), challenges a uniform, nationwide initiative orchestrated by the United States Department of Agriculture ("USDA") to restrict access to, and ultimately shrink the size and efficacy of, the Supplemental Nutrition Assistance Program ("SNAP"). USDA did so by encouraging States to submit "food restriction" waivers and then by sending the States a standard template for those submissions. Twenty-three States and counting followed USDA's direction by submitting waivers using the USDA template. USDA approved every waiver on materially identical terms and implemented a single federal framework to enforce the waivers against every SNAP retailer in the waiver States. The result is a set of unlawful waivers, all stemming from the same unlawful course of conduct driven by USDA.

2. SNAP provides funds that low-income households use to purchase food they would otherwise be unable to afford. It is an essential lifeline for many families nationwide, and a critical economic engine: every dollar spent on SNAP creates more than $1.50 of economic activity in communities across the country.

3. For more than sixty years, Congress maintained a single, uniform definition of "food" for SNAP purposes nationwide, which provided SNAP recipients and SNAP-accepting retailers a consistent set of rules for the program. USDA's uniform approval of the challenged waivers has displaced that single nationwide standard with USDA's waiver program, which has thrown SNAP into disarray across the country by dismantling the long-standing, consistent definition of "food."

4. The SNAP Recipient Plaintiffs and members of the proposed classes are SNAP recipients subject to food restriction waivers USDA approved through the challenged initiative.

They are low-income individuals who rely on SNAP to purchase food sufficient to feed themselves and their families. Each SNAP recipient suffers the same common injury: the loss of full use of essential benefits guaranteed by federal law. As a result of this injury, SNAP recipients, including the SNAP Recipient Plaintiffs, cannot manage chronic health conditions and disabilities, buy preferred foods for their children, or purchase foods and beverages needed to complete work and school obligations or meet their basic health needs.

5. Plaintiff SCCPMA is a membership organization whose members include SNAP-authorized retailers bound by the waivers. Each of SCCPMA's SNAP retailer members faces increased compliance costs as a result of the South Carolina waiver and the threat of involuntary withdrawal from SNAP because of USDA's enforcement of the South Carolina waiver.

6. The twenty-three waivers USDA has approved thus far all narrow the statutory definition of "food" for SNAP purposes in the same unlawful manner. USDA approved each waiver pursuant to 7 U.S.C. § 2026(b). As the Court held in *Aragon v. Rollins*, No. 1:26-cv-00861 (ABJ) (D.D.C. June 22, 2026) ("*Aragon*"), however, USDA has no statutory authority to approve food restriction waivers that purport to address health and nutrition under 7 U.S.C. § 2026(b), as that provision authorizes only narrow, administration-focused pilot projects. The *Aragon* Court held that if the food restriction waivers' stated purpose is cognizable at all, it is cognizable only under the separate and more demanding requirements of a different provision—7 U.S.C. § 2026(k).

7. In approving these waivers, USDA reversed its own prior position without explaining the basis for its sudden reversal. In 2018, USDA rejected materially identical state proposals, explaining that such restrictions would increase administrative costs, burden retailers, force arbitrary line-drawing among food products, and restrict household food choices without

demonstrated health benefits. All of those concerns still apply, as SNAP recipients, anti-poverty groups, and retailers emphasized in public comments USDA recently received.

8. USDA also failed to consider whether various statutory requirements were met before approving the waivers.

9. In addition, USDA violated its own regulation as to a subset of the waivers. That regulation requires USDA to publish a General Notice in the Federal Register at least 30 days before the initiation of any demonstration project that will likely have a significant impact on the public. These waivers restrict what more than 12.8 million SNAP recipients can buy and impose new compliance obligations on thousands of SNAP-accepting retailers across twenty-three States. Yet USDA initially published no notice for any of them. Not until *Aragon* held that USDA had violated its own regulation by implementing materially identical food restriction waivers without first publishing notice in the Federal Register did USDA publish notices requesting public comment. USDA's regulation requires notice "[a]t least 30 days prior to the initiation of a demonstration project." 7 C.F.R. § 282.1(b). Publication of a General Notice after the waiver has taken effect, as is the case for the waivers from eight States, fails to satisfy the regulation.

10. USDA backed the waivers with a single nationwide enforcement framework. Its December 30, 2025 guidance (the "USDA Guidance") binds every walk-in retailer in a waiver State, along with every retailer that fills a SNAP recipient's online order from a warehouse. The USDA Guidance sets forth uniform, draconian enforcement plans that include a surveillance regime of secret shoppers and the threat of involuntary termination from the program for a second infraction of the food restriction waiver rules.

11. As a direct result of USDA's uniform approval and enforcement initiative, SNAP recipients in every affected State face the same loss: the ability to rely on SNAP to purchase the same range of food they could before USDA approved the waiver in their State. Likewise, SCCPMA's members face compliance burdens and the risk of involuntary removal from SNAP.

12. In approving and enforcing these waivers through the uniform conduct described above, Defendants exceeded their statutory authority under 7 U.S.C. § 2026(b); failed to engage in reasoned decision-making, including by failing to acknowledge or explain USDA's own reversal of its 2018 position and failing to consider whether the waivers met a permissible purpose under Section 2026(b); and, as to a subset of States, violated the notice-and-comment procedures required by law.

13. These violations arise from USDA's own common conduct and apply to each proposed class as a whole.

14. These violations also cause harm to SCCPMA's members.

15. All of the approvals must therefore be set aside, and USDA must be barred from approving and enforcing future food restriction waivers under 7 U.S.C. § 2026(b).

## JURISDICTION AND VENUE

16. This is an action for declaratory and injunctive relief for violations of the Administrative Procedure Act ("APA") and the Food and Nutrition Act of 2008.

17. The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1361, and 5 U.S.C. §§ 702–705. This action and the remedies it seeks are further authorized by 28 U.S.C. §§ 1651, 2201, and 2202, and Federal Rule of Civil Procedure 65.

18. Venue is proper under 28 U.S.C. § 1391(b)(2), (e).

**PARTIES**

19. Plaintiff Kristin Meyer resides in Nampa, Idaho, and relies on SNAP benefits to afford groceries. She has multiple chronic health conditions, including autonomic dysfunction (dysautonomia), autoimmune conditions, and myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS), which make it difficult for her to regulate her blood pressure, heart rate, temperature, and blood sugar levels. Plaintiff Meyer must maintain adequate nutrition and hydration to manage her health conditions. She also has executive function and sensory processing limitations that make feeding herself difficult. Plaintiff Meyer needs electrolyte-infused hydration drinks and easy-to-eat foods, such as nutrition and granola bars, that are now restricted under Idaho's waiver, and she does not have additional funds to buy them. Since the waiver was implemented, she has frequently been dehydrated, and her kidney function, digestion, and autonomic function, which affect her heart and ability to remain upright, have worsened.

20. Plaintiff Tamara Wagner resides in Fargo, North Dakota, and relies on SNAP benefits to feed herself. She has been disabled for most of her life. Plaintiff Wagner has Postural Orthostatic Tachycardia Syndrome, which requires her to stay hydrated with electrolyte drinks; diabetes that requires quick-sugar sources like candy to manage blood sugar drops; and Ehlers-Danlos Syndrome. She often experiences nausea when she eats and relies on diet soda because the carbonation helps manage her nausea. She takes medications throughout the day that must be taken with food, so she relies on quick, easy foods to eat multiple times a day. Her SNAP benefit allotment is too low for her to afford fresh produce as often as she must eat to take her medications. Plaintiff Wagner lives on a limited income and cannot afford restricted items without her SNAP benefits. Under North Dakota's food restriction waiver, she is unable to purchase the items she needs to manage her health conditions, and as a result, she is at risk of

hospitalization. Although the waiver has been in effect for only a few weeks, she is already rationing the beverages she needs and experiencing significant nausea and bloating. Because of her increased nausea, she has been unable to take her prescribed medications regularly, and her blood sugar has become unstable.

21. Plaintiff Stephanie Morgan resides in Tulsa, Oklahoma, and relies on SNAP to buy groceries. She currently lives in an extended-stay hotel without access to a kitchen, so her diet is restricted to processed, easy-to-prepare foods. She has upper gastrointestinal issues that cause discomfort when gas gets trapped in her esophagus. Because of this condition she relies on drinking soda to help release the gas. Plaintiff Morgan also has inconsistent blood sugar levels, and she relies on candy to boost her blood sugar as needed. If she does not raise her blood sugar quickly, she experiences nausea for the rest of the day. Soda, candy, and other shelf-stable, easy-to-prepare foods are restricted items under Oklahoma's food restriction waiver, and because Plaintiff Morgan does not have other funds to spend on groceries, she is unable to purchase the groceries she needs to manage her health.

22. Plaintiff James Ness resides in Bismarck, North Dakota, and relies on SNAP to buy groceries. He currently lives in a homeless shelter that does not provide meals and has only a microwave for cooking, so he can buy only ready-to-eat, shelf-stable foods. Plaintiff Ness is autistic, with severe sensory processing sensitivities, and has Post-Traumatic Stress Disorder. To prevent sensory overload, autistic shutdowns, or meltdowns, he requires specific sensory-regulating safe foods, including specific branded and flavored sodas and candies. He also relies on chewing gum and mints to ground himself during PTSD-related flashbacks and panic responses. These needs are hard to meet through community meals, food banks, and food pantries. He does not have any funds other than SNAP with which to buy groceries. Under

North Dakota's food restriction waiver, he is unable to purchase many of the foods and beverages he needs to maintain his physical and mental health.

23. Plaintiff Christy Trent resides in Vinton, Virginia, with her husband and their 9-year-old granddaughter and relies on SNAP benefits to feed herself and her family. Plaintiff Trent is unable to work because she suffers from medical conditions that cause dizziness and fainting. The only way she can stop a dizzy spell and prevent fainting is quickly drinking a soda. Plaintiff Trent does not have additional funds other than SNAP to spend on restricted items. Under Virginia's food restriction waiver, she is no longer able to purchase the soda she needs to manage her dizzy spells.

24. Plaintiff Ron Glick resides in Kalispell, Montana, and relies on SNAP benefits to buy groceries. Plaintiff Glick has hypoglycemia, which requires quick access to sugars, such as from candies, protein or granola bars, or high-energy drinks and soda. Without access to these quick sugars, he experiences migraines, dizziness, or, sometimes, fainting spells. Plaintiff Glick does not have money other than his SNAP benefits to purchase food. Under Montana's food restriction waiver, he is unable to purchase the items he needs to manage his hypoglycemia.

25. Plaintiff Rhonda Salinas resides in Corpus Christi, Texas, with her three children—a 15-year-old daughter, a 5-year-old son, and a 3-year-old son. She and her family rely on SNAP to afford groceries. Plaintiff Salinas' younger children are limited in what they will eat and drink, and she struggles to keep them hydrated and nourished. Plaintiff Salinas has to supplement water with flavoring and sweeteners to prevent her children from becoming dehydrated. Under Texas' food restriction waiver, Plaintiff Salinas cannot purchase the items she and her children usually rely on to maintain her children's nutrition because she does not have additional funds to purchase foods and beverages restricted by the waiver.

26. Plaintiff Christina McRae resides in Coeur d'Alene, Idaho, with her soon-to-be 18-year-old daughter. She relies on SNAP benefits to buy groceries for her household. Plaintiff McRae suffers from anxiety that causes nausea and relies on ginger candy for nausea management. However, ginger candy is now prohibited under Idaho's waiver. She can also no longer purchase bottled iced tea under Idaho's waiver—a beverage that she used to buy regularly. Plaintiff McRae does not have additional funds with which to buy items restricted by Idaho's waiver, and thus, because of the waiver she is unable to purchase the items she needs for herself and her daughter.

27. Plaintiff Nicole Noblet resides in Kansas City, Missouri, and relies on SNAP benefits to buy groceries. Plaintiff Noblet has various health conditions that require a specific diet, including celiac disease and gastroparesis. Her doctor also suspects she has hypoglycemia. Plaintiff Noblet's gastroparesis makes it difficult for her to digest foods, and thus, her body struggles to absorb sugar from solid foods. Plaintiff Noblet, therefore, must consume energy drinks or cola to quickly manage her blood sugar. She does not have additional funds other than SNAP to purchase groceries. Once Missouri's food restriction waiver goes into effect, she will no longer be able to purchase the items she needs to manage her health.

28. Plaintiff Gerard Rogers resides in Springfield, Missouri, and relies on SNAP to afford groceries. Plaintiff Rogers is diabetic and needs quick access to easy sugar sources, such as candy bars, to manage low blood sugar. He does not have additional funds to purchase food items outside of his SNAP benefits. Once Missouri's food restriction waiver goes into effect, he will no longer be able to purchase items that he needs to manage his diabetes, such as candy bars.

29. Plaintiff Kathryn Fitzpatrick resides in Missoula, Montana, and relies on SNAP benefits to afford groceries. Plaintiff Fitzpatrick has autism and ADHD that impact her diet along with how she must eat. Because of her ADHD, cooking is very difficult and she is not always able to process when she is hungry. Therefore, Plaintiff Fitzpatrick often needs a quick, easy-to-eat item to give her an energy boost before she can cook a full meal. She also relies on energy drinks to help manage her ADHD. Plaintiff Fitzpatrick does not have any additional funds outside of SNAP benefits with which to buy groceries. Under Montana's food restriction waiver, she is unable to purchase the items she relies on to maintain her health.

30. Plaintiff Nichole Martin resides in Tyler, Texas, and relies on SNAP to afford groceries. Her budget is very tight, and she is currently without a permanent place to live. Plaintiff Martin does not have extra funds to buy groceries prohibited by the Texas food restriction waiver. Plaintiff Martin works part time caring for hospice patients in their homes, which requires her to travel to and from people's homes in the Texas heat. To do her job, she needs to stay hydrated and maintain her energy. Under Texas' food restriction waiver, Plaintiff Martin is unable to purchase the beverages she normally relies on during her long workdays, such as Gatorade, Powerade, and Ocean Spray.

31. Plaintiff Jakob Nasakaitis resides in San Marcos, Texas, and relies on SNAP to afford groceries. Plaintiff Nasakaitis is a student at Texas State University studying computer science. His degree requires him to sit in front of a computer for long hours programming. Plaintiff Nasakaitis relies on energy drinks to stay productive at school, while doing homework, and at his internship. Plaintiff Nasakaitis does not have additional funds to buy products prohibited by the Texas food restriction waiver, so he is unable to purchase the energy drinks he relies on to meet his academic and professional obligations.

32. Plaintiff Kim Kovarikova resides in Charlottesville, Virginia, and relies on SNAP to feed herself. Plaintiff Kovarikova drinks soft drinks, such as caffeine-free root beer, to provide her daily hydration needs. She struggles to drink enough water to stay hydrated. She does not have additional funds other than SNAP to purchase restricted items. Under Virginia's food restriction waiver, she is no longer able to purchase the soft drinks she has been consuming her entire life to manage her hydration needs.

33. Plaintiff Bernardo Valdes resides in Miami, Florida, and has relied on SNAP to feed himself since being diagnosed with multiple sclerosis. Before the implementation of Florida's food restriction waiver, he bought candy and soda. Under Florida's food restriction waiver, he is unable to use his SNAP benefits to purchase the items he normally would, and he has no additional funds outside of his SNAP benefits with which to buy groceries.

34. Plaintiff Charlotte Roman resides in Tallahassee, Florida, and relies on SNAP to afford groceries. She is a senior citizen who relies on disability benefits and Social Security as her only income. Plaintiff Roman used to buy soda or dark chocolate with her SNAP benefits, but she cannot do so under the Florida food restriction waiver. Because of her low fixed income, she does not have additional money to buy items restricted by the waiver.

35. Plaintiff Stanley Jesseph resides in Newton, Kansas, and relies on SNAP to buy groceries. Plaintiff Jesseph is a member of the Railway Clubhouse, a program that offers social and vocational programs and service opportunities for those living with severe and persistent mental illness. He has a limited food budget and will not be able to purchase the restricted items with other funds after Kansas' waiver goes into effect. Under Kansas' food restriction waiver, he will no longer be able to purchase items that he normally buys, such as juice and pop.

36. Plaintiff SCCPMA is a 501(c)(6) membership organization of convenience stores and gas stations headquartered and doing business in South Carolina. Numerous SCCPMA members are authorized SNAP retailers. All of SCCPMA's SNAP retailer members are subject to the South Carolina waiver, and some are subject to multiple state waivers.

37. Defendant Brooke Rollins is the Secretary of Agriculture. Defendant Rollins is being sued in her official capacity. Secretary Rollins (the "Secretary") has overall responsibility for the implementation of SNAP, including responsibility for federal review and approval of state waiver requests.

38. Defendant USDA is a department of the executive branch of the United States government and an agency of the federal government within the meaning of 5 U.S.C. § 551(1). USDA is headquartered in Washington, D.C.

## STATUTORY BACKGROUND

### The Supplemental Nutrition Assistance Program

39. In 1964, Congress established the federally funded, state-administered Food Stamp Program in order to "safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households," and to "permit low income households to obtain a more nutritious diet through normal channels of trade by increasing food purchasing power for all eligible households who apply for participation." 7 U.S.C. § 2011; 7 C.F.R. § 271.1.

40. Effective October 1, 2008, the federal Food Stamp Program was renamed the Supplemental Nutrition Assistance Program, and the federal Food Stamp Act was renamed the Food and Nutrition Act of 2008 ("SNAP Act"). Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, §§ 4001–4002, 4407, 122 Stat. 1651, 1853.

41. SNAP serves households with very low incomes, who cannot otherwise afford adequate food.

42. Once a household applies for and is approved for SNAP, benefits are loaded onto Electronic Benefits Transfer ("EBT") cards. EBT cards can be used at participating SNAP retailers to purchase authorized products in the same manner as a debit card.

43. Each participating State designates a single state agency to administer SNAP and comply with federal requirements. 7 U.S.C. § 2020(a), (d), (e). States have some discretion in how they run the program, but certain requirements apply nationwide. One of them is the definition of "food." Congress defined "food" as "any food or food product for home consumption except alcoholic beverages, tobacco, hot foods or hot food products ready for immediate consumption." *Id.* § 2012(k). SNAP benefits may be used only to buy "food" as so defined. 7 C.F.R. § 274.8. The statute also includes limited exceptions that expand access for certain populations. For example, in specified circumstances, elderly individuals, persons with disabilities, and individuals residing in certain treatment facilities may use SNAP benefits to purchase prepared meals provided by nonprofit organizations or served in facilities in which they reside. In addition, SNAP benefits may, in certain circumstances, be used to purchase supplies for growing or hunting food.

44. The statutory definition of "food" has consistently permitted SNAP households to purchase a broad range of foods, enabling families to meet individualized nutritional and medical needs.

45. To the extent Congress has amended the statutory definition of "food" since the program's establishment in 1964, it has done so to expand—rather than restrict—eligible purchases.

46. The Food and Nutrition Act has always provided a consistent definition of "food" across the country, affording SNAP recipients and participating retailers alike to have clarity on which products can and cannot be purchased with SNAP benefits no matter where in the country the purchase takes place.

47. USDA's regulations mirror the statute. 7 C.F.R. § 271.2 defines "eligible food" in terms that are substantively identical to 7 U.S.C. § 2012(k).

48. SNAP recipients can be subjected to temporary disqualification, permanent disqualification, and criminal penalties if they are determined to have used SNAP benefits for impermissible purposes. 7 U.S.C. §§ 2015(b), 2024(b).

49. In order to use SNAP benefits, recipients purchase eligible food items at authorized retailers. To become authorized, a retailer must apply to the Food and Nutrition Administration ("FNA"), a subagency of USDA. 7 C.F.R. § 278.1(a). USDA regulations set forth detailed criteria governing retailer eligibility. 7 C.F.R. § 278.1. Among other requirements, retailers must demonstrate that they offer a variety of staple foods or that a substantial portion of their total sales consists of staple foods. *Id.* USDA regulations define "staple food" as "food intended for home preparation and consumption, excluding accessory foods, in each of the following four categories: (1) [p]rotein, including plant-based sources; (2) [g]rains; (3) [v]egetables or fruits; and (4) [d]airy, including plant-based alternatives." 7 C.F.R. § 271.2.

50. FNA may withdraw a retailer's authorization if it no longer satisfies these eligibility requirements. 7 C.F.R. § 278.1(b)(1)(iv).

51. SNAP retailers can be subjected to involuntary withdrawal and civil monetary penalties if they are determined to have accepted SNAP benefits in exchange for anything other than a permissible product. 7 U.S.C. § 2021(a)(1); *see infra* ¶¶ 82–85.

**Permissible Demonstration Projects**

52. Under 7 U.S.C. § 2026(b), the Secretary of Agriculture is authorized to approve "pilot or experimental projects designed to test program changes" to "increase the efficiency" of SNAP and "improve the delivery" of benefits to eligible households.

53. A project approved under Section 2026(b) must serve one of four permissible purposes: (1) improving program administration; (2) increasing the self-sufficiency of SNAP recipients; (3) testing innovative welfare reform strategies; or (4) allowing greater conformity with the rules of other programs. 7 U.S.C. § 2026(b)(1)(B)(ii). These have been the only four permissible bases for a pilot project under Section 2026(b) since 1996. Projects properly approved under Section 2026(b) have tested changes to how SNAP is administered or delivered, such as using paper vouchers in place of EBT cards. The food restriction waivers are different in kind. They change what SNAP benefits may buy, not how the program is administered.

54. The Secretary "may waive any requirement of this chapter to the extent necessary" for an allowable pilot project to be conducted. 7 U.S.C. § 2026(b)(1)(A).

55. Each pilot or experimental project approved under Section 2026(b) must also include "an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II).

56. A separate provision allows the Secretary to carry out pilot projects to develop and test methods of using SNAP to improve the dietary health status of households to, among other things, reduce obesity and associated co-morbidities. 7 U.S.C. § 2026(k)(1).

57. However, projects conducted under Section 2026(k) must satisfy a stringent set of requirements. To start, projects under Section 2026(k) must be evaluated against publicly disseminated criteria. 7 U.S.C. § 2026(k)(2)(C). Section 2026(k) also identifies specific types of health-focused interventions that may be tested, including projects that increase benefit

allotments, expand access to farmers' markets, incentivize the purchase of healthy foods, impose stricter retailer stocking requirements for healthy foods, or provide nutrition education to households. 7 U.S.C. § 2026(k)(3).

58. Congress further required that Section 2026(k) projects employ "rigorous" evaluation methodologies capable of producing "scientifically valid information" regarding effectiveness. 7 U.S.C. § 2026(k)(4).

59. Section 2026(b) and Section 2026(k) are separate statutory pathways for pilot projects, each designed for different purposes with their own substantive prerequisites: Section 2026(b) permits narrow, administration-focused pilot projects aimed at efficiencies in the administration of SNAP, whereas Section 2026(k) alone authorizes health- and nutrition-motivated projects, and only subject to the rigorous, publicly disseminated evaluation criteria described above.

**Notice and Comment Requirement**

60. USDA regulations require that, for demonstration projects approved pursuant to 7 U.S.C. § 2026, the Secretary must publish a General Notice in the Federal Register if the project "will likely have a significant impact on the public." 7 C.F.R. § 282.1(b). That notice must set forth "specific operational procedures" and "explain the basis and purpose" of the project. *Id.* If significant comments are received, the USDA must take appropriate action before implementation and must publish an additional notice 30 days before implementation if significant changes are made in response to the comments. *Id.*

## FACTUAL BACKGROUND

61. The challenged waivers are the product of a single USDA initiative. Every challenged waiver traces to the same course of agency conduct, described below.

**Food Restriction Waiver Approval Process**

62. Since May 2025, USDA has approved demonstration projects in twenty-three States that purport to modify the definition of "food" found in 7 U.S.C. § 2012(k).

63. These demonstration projects are colloquially referred to as "food restriction waivers" and have the effect of imposing new restrictions on the foods and beverages that retailers may sell, and SNAP recipients may purchase, in exchange for SNAP benefits.

64. USDA invited the waivers. In 2025, the Secretary publicly called on the States to submit waivers limiting what can be purchased with SNAP benefits, and USDA's website continues to encourage States to submit them.[1]

65. USDA provided the States with a template for waiver submissions that framed each project around encouraging "healthy choices, healthy outcomes, and healthy families."

66. The central legal defect in the eighteen challenged waivers is the same defect the *Aragon* Court has already found fatal. In *Aragon*, the Court vacated five materially identical waivers on the ground that Section 2026(b) does not authorize projects aimed at improving the health of SNAP recipients. Although USDA approved the eighteen waivers challenged here under the same provision, for the same purpose, and on the same terms, USDA has not withdrawn or reconsidered any of them following *Aragon*. To the contrary, USDA has made post-*Aragon* requests for comment on these waivers and continues to rely exclusively on Section 2026(b) as its source of authority.

67. Defendants approved the food restriction waivers pursuant to 7 U.S.C. § 2026(b)(1)(B)(i)–(ii), and they did not invoke or purport to satisfy any other statutory authority. The waivers do not meet the requirements of Section 2026(b) because they are not "pilot or

[1] *See* https://www.fns.usda.gov/snap/waivers/foodrestriction.

experimental projects designed to test program changes" that "increase the efficiency" of SNAP or "improve the delivery" of benefits to eligible households, as required by 7 U.S.C. § 2026(b).

68. The challenged waivers fail to meet Section 2026(b)'s requirements in other ways. The waivers do not serve any of the four permissible project purposes listed in 7 U.S.C. § 2026(b). They do not improve program administration, increase the self-sufficiency of SNAP recipients, test innovative welfare reform strategies, or allow greater conformity with the rules of other programs, and they do not describe or explain how they could do so. Nor do they allow greater conformity with the rules of other programs because the definition of "food" in SNAP has no interaction with the rules of other programs.

69. USDA did not even consider whether the waivers met a permissible purpose under 7 U.S.C. § 2026(b).[2] USDA issued approval letters in materially the same words, each expressing appreciation for the State's "willingness to test innovative approaches to support healthy choices, and healthy outcomes to best serve SNAP participants." But 7 U.S.C. § 2026(b) does not concern recipients' health or nutritional outcomes. Such pilots must be conducted, if at all, under 7 U.S.C. § 2026(k) pursuant to its more stringent requirements.

70. In approving the waivers pursuant to Section 2026(b), USDA also failed to comply with that provision's evaluation requirements. Section 2026(b) requires every project to include "an evaluation to determine the effects of the project." Yet the approvals defer that requirement. They uniformly direct each State to "provide a finalized evaluation plan" before implementation, and they describe that plan as one "defining Project health outcomes and behaviors tracked throughout the Project."

---

[2] *See Id.*

71. The prospective evaluations USDA planned in the waivers were intended to measure health outcomes, and the waivers therefore could have been approved, if at all, only under the more stringent requirements of Section 2026(k). That alone forecloses USDA's reliance on Section 2026(b) as statutory authority for the waivers.

72. That said, the evaluations still do not satisfy Section 2026(b) because they do not measure program efficiency. None of the waivers are designed to test program changes that might increase the efficiency of SNAP or the delivery of benefits. Critical details—such as how each State will define waiver "success," which data points and metrics will be collected, and how those data will be analyzed—will not be determined, if at all, until after approval.

73. In January 2018, USDA rejected materially similar proposals submitted by Maine and Nevada. Maine sought to disallow "sugar sweetened beverages and candy." Nevada sought to disallow "sugary drinks," or "sugar sweetened drinks."

74. USDA rejected those proposals on the grounds that they would:

- Increase the costs of administering SNAP for states and retailers;
- Impose significant burdens on small businesses and private retailers;
- Require the government to select "winners and losers" in the food industry;
- Present difficulty in delineating nutritional benefits for allowable and excluded foods; and
- Restrict what individuals may eat in their own homes without clear evidence of meaningful health outcomes.

75. The waiver applications at issue here and USDA's letters approving them all fail to address the concerns USDA itself identified when rejecting materially similar proposals in 2018. As detailed below, many of the comments that were submitted in response to USDA's belated notice and comment period raise these very concerns. USDA, nonetheless, has signaled no intention to meaningfully respond to those comments.

76. USDA's posture toward these restrictions has thus reversed entirely, from rejection to active solicitation, without any reasoned explanation for the change. Having concluded in 2018 that these types of restrictions were unworkable, including because they would raise costs and thereby undermine one of the goals of 7 U.S.C. § 2026(b), USDA now reverses course. This conduct is arbitrary and capricious, and it uniformly applies to all of the waiver States. USDA now solicits food restriction waivers from the States, supplies a standard template for States to use in submitting them, and has approved every single waiver submitted under that template on materially identical terms. That reversal, and USDA's failure to explain it, is a single common defect that runs through every challenged waiver approval, regardless of which State submitted the waiver or which products it restricts.

77. The food restriction waivers all contain certain identical features. None of them provides any exception for individual medical, nutritional, occupational, or household circumstances. Each applies to all SNAP recipients in the respective State in which it is in effect and does not allow anyone to opt out. All retailers in waiver States are likewise prohibited from accepting SNAP benefits in exchange for items prohibited under the relevant State's waiver. As a result, the food restriction waivers directly impact every SNAP recipient and every SNAP-authorized retailer in each State where a waiver has been approved.

78. In addition, none of the waivers contains any effective guidance to help recipients and retailers determine which products qualify for purchase. Every waiver relies on undefined terms—such as "artificial sweeteners," "milk substitutes," "candy," and "soft drinks." All of them thus shift the burden onto recipients and retailers to determine whether a particular product qualifies as a permissible SNAP purchase under the altered definition of "food" that the waiver imposes.

79. Despite their wide-ranging impact, USDA did not follow the notice-and-comment procedures of 7 C.F.R. § 282.1(b) for thirteen of the food restriction waivers, including the five vacated in *Aragon* and eight of those challenged here.

80. In the December 30, 2025 informational memorandum accompanying the USDA Guidance, USDA concluded that the General Notice Rule, 7 C.F.R. § 282.1(b), "is not applicable to the Food Restriction Waivers" (the "Notice-and-Comment Determination"). USDA reached that conclusion once for the initiative as a whole. It made no waiver-by-waiver assessment of whether a particular waiver would have a significant impact on the public. Then, on June 22, 2026, *Aragon* held that determination unlawful and vacated the memorandum. Only after that ruling did USDA begin publishing Federal Register notices requesting comment on waivers.

81. USDA's General Notices in the Federal Register came after USDA implemented the waivers in Arkansas, Florida, Idaho, Indiana, Louisiana, Oklahoma, Texas, and Utah. As a result, affected households, including the Notice and Comment Class, along with retailers, advocates, and other members of the public, were denied any meaningful opportunity to address the waivers' statutory deficiencies and foreseeable real-world harms.

**Enforcement of Food Restriction Waivers**

82. On December 30, 2025, USDA issued the USDA Guidance "clarify[ing] FNS policies and plans for SNAP-retailer compliance with [food restriction] waivers, including guidance on which SNAP retailers must comply, online orders and deliveries, and the consequences for non-compliance." The USDA Guidance will be applicable to all SCCPMA members that accept SNAP transactions.

83. The USDA Guidance states that, "[a]s of December 30, 2025, FNS has approved 18 State agency requests to implement a SNAP Food Restriction Waiver and is poised to approve more in the future." It further states that, after the expiration of a 90-day grace period, SNAP retailers "will be subject to investigation to determine compliance with the applicable SNAP Food Restriction Waiver(s)." According to the USDA Guidance, USDA intends to use undercover investigations to determine whether a retailer is complying with the relevant waiver or waivers, and any waiver noncompliance discovered by States must be reported to USDA. That surveillance will apply to SCCPMA members.

84. Following a first instance of noncompliance, USDA will send the retailer a warning letter, and 30 days after issuance of that warning letter, USDA will conduct additional investigations. If additional or continuing noncompliance is found, the retailer is removed from SNAP through involuntary withdrawal. When USDA subjects a retailer to involuntary withdrawal, it can take years for that retailer to regain its status as an authorized SNAP retailer. That outcome could seriously harm retailers, including SCCPMA members, that depend on SNAP.

85. The USDA Guidance further states that all walk-in SNAP retailers within a waiver State must comply with the waiver in effect in that State; that an online retailer fulfilling a SNAP order from a warehouse must comply with the waiver, if any, in the purchaser's State; and that an online retailer fulfilling a SNAP order from the stock of a walk-in location must comply with the waiver, if any, in the State where the walk-in store sits—in each case regardless of whether the order is picked up or delivered. These provisions will apply to SCCPMA members that accept SNAP transactions.

**The Food Restriction Waivers Utilize Inconsistent Definitions of "Food"**

86. The food restriction waivers constitute a significant deviation from more than sixty years of precedent, during which the definition of "food" for the purposes of SNAP was consistent across the country.

87. Under a consistent definition of "food," recipients could rely on a single, predictable set of essential subsistence benefits regardless of where they lived or shopped. Crossing state lines, or shopping online rather than in person, did not affect what their SNAP benefits could buy. That uniformity is precisely what 7 U.S.C. § 2012(k) and 7 C.F.R. § 274.8(b)(10) guarantee, and precisely what the food restriction waivers destroy. All of the challenged waivers specifically state that the relevant waiver "may not in any way impede inter-operability of SNAP program benefits, as detailed in 7 CFR 274.8 (b)(10)." Yet the challenged food restriction waivers do exactly that.

88. The food restriction waivers replace that single, nationwide definition of "food" with a patchwork of state-specific ones—undermining the uniform, portable benefit that federal law guarantees to every SNAP recipient. The result is the very harm the interoperability mandate exists to prevent: SNAP benefits now depend on where a SNAP recipient lives or attempts to purchase a product. All SNAP recipients across each of the waiver States face the impact this loss of uniformity has on the program.

**The Challenged State Waivers**

89. Each of the eighteen challenged waivers is described in pertinent part below. Although the waivers differ in the specific products they restrict, the legal questions they present are the same regardless of which State submitted each waiver or which products it restricts. Those legal questions are as follows.

90. *First*, as to the Food Restriction Class, whether projects designed to improve the diet, health, or nutrition of SNAP recipients may be approved, if at all, only under 7 U.S.C. § 2026(k), and not under Section 2026(b), as USDA did for every challenged waiver. *See supra* ¶¶ 52–59.

91. *Second*, as to the Food Restriction Class, and in the alternative, whether a waiver that restricts the definition of "food" can satisfy Section 2026(b)—that is, whether it is a "pilot or experimental project[] designed to test program changes" that serves one of the four permissible purposes of Section 2026(b)(1)(B)(ii) and includes "an evaluation to determine the effects of the project," Section 2026(b)(1)(B)(i)(II). *See supra* ¶¶ 52–59.

92. *Third*, as to the Food Restriction Class, whether USDA's approval of the waivers, without acknowledging or explaining its reversal from its 2018 rejection of materially similar restrictions or engaging with the permissible purposes listed in 7 U.S.C. § 2026(b), was arbitrary and capricious. *See supra* ¶¶ 62–78.

93. *Fourth*, as to the Notice and Comment Class, whether USDA violated 7 C.F.R. § 282.1(b) by implementing waivers before providing the required notice and opportunity to comment, pursuant to a single Notice-and-Comment Determination made for every waiver, and whether USDA's belated post-*Aragon* requests for comment can cure that violation. *See supra* ¶¶ 60, 75–81.

94. The state-specific allegations below identify, for each waiver, the dates of submission, approval, and implementation; the products restricted; and any facts specific to that waiver. The following allegations apply to every challenged waiver:

- Each State submitted its waiver request either on USDA's template form or following the template's organization.

- Each challenged waiver allows the State agency to modify the statutory exceptions to the definition of "food" and the regulatory exceptions to the definition of "eligible foods." Each is authorized for a period of two years, and each State agency may request three annual extensions, which if approved would bring the total length of the waiver to five years.
- Each challenged waiver suffers from the deficiencies common to every challenged waiver. USDA approved each under 7 U.S.C. § 2026(b) to pursue health and nutrition goals that may be pursued, if at all, only under Section 2026(k). *See supra* ¶¶ 52–59. In the alternative, no challenged waiver satisfies Section 2026(b), because none serves any of that provision's four permissible purposes or contains an evaluation method capable of determining whether it improves the efficiency of SNAP or the delivery of benefits. *See supra id.* In each of its post-*Aragon* requests for comment, USDA continues to rely on Section 2026(b) as the sole authority for the waiver.
- None of the challenged waivers provided exceptions for medical necessity.
- In addition, pursuant to the Notice-and-Comment Determination, USDA implemented the Arkansas, Florida, Idaho, Indiana, Louisiana, Oklahoma, Texas, and Utah waivers (and, for Oklahoma, its later modifications) without the notice and comment required by 7 C.F.R. § 282.1(b), and each went into effect before any opportunity for public comment. USDA belatedly requested comment on each of these waivers on September 15, 2026. These post-*Aragon* requests for comment cannot cure the waivers' defects.

**Arkansas Food Restriction Waiver**

95. Arkansas participates in SNAP. The Arkansas Department of Human Services ("Arkansas DHS") is the single state agency responsible for administering SNAP in Arkansas. Ark. Code Ann. § 20-76-201 (2024).

96. On April 15, 2025, Arkansas DHS submitted a request for approval of a demonstration project.

97. USDA approved the demonstration project ("Arkansas waiver") on June 10, 2025.

98. Specifically, the Arkansas waiver authorizes Arkansas DHS to prohibit the use of SNAP benefits for the purchase of "soda, low and no-calorie soda, fruit and vegetable drinks with less than 50% natural juice, unhealthy drinks, and candy."

99. The Arkansas waiver went into effect on July 1, 2026, before USDA's belated requests for comment.

**Florida Food Restriction Waiver**

100. Florida participates in SNAP. The Florida Department of Children and Families ("Florida DCF") is the single state agency responsible for administering SNAP in Florida. Fla. Stat. § 414.31 (2025).

101. On May 29, 2025, Florida DCF submitted a request for approval of a demonstration project via the template form provided by USDA.

102. USDA approved the demonstration project ("Florida waiver") on August 4, 2025.

103. Specifically, the Florida waiver authorizes Florida DCF to prohibit the use of SNAP benefits for the purchase of "soda, energy drinks, candy, and prepared desserts."

104. The Florida waiver went into effect on April 20, 2026, before USDA's belated requests for comment.

105. Plaintiffs Valdes and Roman, both Florida SNAP recipients, were not given the opportunity to comment on the Florida waiver before it went into effect. Both of these Plaintiffs would have commented before the waiver went into effect if given the opportunity.

**Hawaii Food Restriction Waiver**

106. Hawaii participates in SNAP. The Hawaii Department of Human Services ("Hawaii DHS") is the single state agency responsible for administering SNAP in Hawaii. Haw. Rev. Stat. § 346-16 (2025).

107. On October 10, 2025, Hawaii DHS submitted a request for approval of a demonstration project via the template form provided by USDA.

108. USDA approved the demonstration project ("Hawaii waiver") on December 10, 2025.

109. Specifically, the Hawaii waiver authorizes Hawaii DHS to prohibit the use of SNAP benefits for the purchase of "soft drinks."

110. The designated start date for the Hawaii waiver is April 1, 2027.

**Idaho Food Restriction Waiver**

111. Idaho participates in SNAP. The Idaho Department of Health and Welfare ("Idaho DHW") is the single state agency responsible for administering SNAP in Idaho. Idaho Code § 56-202 (2026).

112. On May 16, 2025, Idaho DHW submitted a request for approval of a demonstration project via the template form provided by USDA.

113. USDA approved the demonstration project ("Idaho waiver") on June 10, 2025.

114. Specifically, the Idaho waiver authorizes Idaho DHW to prohibit the use of SNAP benefits for the purchase of "soda" and "candy."

115. The Idaho waiver went into effect on February 15, 2026, before USDA's belated requests for comment.

116. Plaintiffs McRae and Meyer, both Idaho SNAP recipients, were not given the opportunity to comment on the Idaho waiver before it went into effect. Both of these Plaintiffs would have commented before the waiver went into effect if given the opportunity.

**Indiana Food Restriction Waiver**

117. Indiana participates in SNAP. The Indiana Family and Social Services Administration ("Indiana FSSA") is the single state agency responsible for administering SNAP in Indiana. Ind. Code § 12-13-5-1 (2025).

118. On April 15, 2025, Indiana FSSA submitted a request for approval of a demonstration project.

119. USDA approved the demonstration project ("Indiana waiver") on May 22, 2025.

120. Specifically, the Indiana waiver authorizes Indiana FSSA to prohibit the use of SNAP benefits for the purchase of "soft drinks" and "candy."

121. The Indiana waiver went into effect on January 1, 2026, before USDA's belated requests for comment.

**Kansas Food Restriction Waiver**

122. Kansas participates in SNAP. The Kansas Department for Children and Families ("Kansas DCF") is the single state agency responsible for administering SNAP in Kansas. Kan. Stat. Ann. § 39-708c (2026).

123. On May 5, 2025, Kansas DCF submitted a request for approval of a demonstration project.

124. USDA approved the demonstration project ("Kansas waiver") on March 4, 2026.

125. Specifically, the Kansas waiver authorizes Kansas DCF to prohibit the use of SNAP benefits for the purchase of "candy" and "soft drinks."

126. The designated start date for the Kansas waiver is February 15, 2027.

**Louisiana Food Restriction Waiver**

127. Louisiana participates in SNAP. Currently, the Louisiana Department of Health ("Louisiana LDH") is solely responsible for administering SNAP in Louisiana. Before October 1, 2025, the Louisiana Department of Children and Family Services ("Louisiana DCFS") was the single state agency responsible for administering SNAP. La. Stat. Ann. § 46:326 (2025).

128. On June 27, 2025, Louisiana DCFS submitted a request for approval of a demonstration project.

129. USDA approved the demonstration project ("Louisiana waiver") on August 4, 2025.

130. The Louisiana waiver authorizes Louisiana DCFS to prohibit the use of SNAP benefits for the purchase of "soft drinks," "energy drinks," and "candy."

131. The Louisiana waiver went into effect on February 18, 2026, before USDA's belated requests for comment.

**Missouri Food Restriction Waiver**

132. Missouri participates in SNAP. The Missouri Department of Social Services ("Missouri DSS") is the single state agency responsible for administering SNAP in Missouri. Mo. Rev. Stat. § 207.010 (2026).

133. On September 29, 2025, Missouri DSS submitted an initial request for approval of a demonstration project and submitted a revised request on October 8, 2025, via the template form provided by USDA.

134. USDA approved the demonstration project ("Missouri waiver") on December 10, 2025.

135. Specifically, the Missouri waiver authorizes Missouri DSS to prohibit the use of SNAP benefits for the purchase of "candy, prepared desserts, and certain unhealthy beverages."

136. The designated start date for the Missouri waiver is February 15, 2027.

**Montana Food Restriction Waiver**

137. Montana participates in SNAP. The Montana Department of Human Services ("Montana DHS") is the single state agency responsible for administering SNAP in Montana. Mont. Code Ann. § 53-2-901 (2019).

138. On March 26, 2026, Montana DHS submitted a request for approval of a demonstration project via the template form provided by USDA.

139. USDA approved the demonstration project ("Montana waiver") on May 19, 2026.

140. Specifically, the Montana waiver authorizes Montana DHS to prohibit the use of SNAP benefits for the purchase of "high-sugar beverages, energy drinks, candy, and prepared desserts."

141. The Montana waiver went into effect on November 1, 2026.

142. Following the conclusion of the comment period on the Montana waiver, USDA published a notice in the Federal Register acknowledging that "[m]ost commenters opposed the project, citing concerns about potential health and nutrition impacts, limits on participant choice, added burden on SNAP households, retailer and consumer confusion, and the project's evaluation measures." Despite these comments, USDA deemed them insignificant and allowed the Montana waiver to proceed without modification.

**Nevada Food Restriction Waiver**

143. Nevada participates in SNAP. The Nevada Department of Human Services ("Nevada DHS") is the single state agency responsible for administering SNAP in Nevada. Nev. Rev. Stat. § 422A.338 (2026).

144. On February 6, 2026, Nevada DHS submitted a request for approval of a demonstration project.

145. USDA approved the demonstration project ("Nevada waiver") on March 4, 2026.

146. Specifically, the Nevada waiver authorizes Nevada DHS to prohibit the use of SNAP benefits for the purchase of "candy" and "sugar-sweetened beverages."

147. The designated start date for the Nevada waiver is February 1, 2028.

**North Dakota Food Restriction Waiver**

148. North Dakota participates in SNAP. The North Dakota Department of Human Services ("North Dakota DHS") is the single state agency responsible for administering SNAP in North Dakota. N.D. Cent. Code § 50-06-01.4 (2023).

149. On October 24, 2025, North Dakota DHS submitted an initial request for approval of a demonstration project via the template form provided by USDA and submitted a revised request on November 3, 2025.

150. USDA approved the demonstration project ("North Dakota waiver") on December 10, 2025.

151. Specifically, the North Dakota waiver authorizes North Dakota DHS to prohibit the use of SNAP benefits for the purchase of "candy," "soft drinks," and "energy drinks."

152. The North Dakota waiver went into effect on November 1, 2026.

153. Following the conclusion of the comment period on the North Dakota waiver, USDA published a notice in the Federal Register acknowledging that "[m]ost commenters opposed the project, citing concerns about potential health and nutrition impacts, limits on participant choice, added burden on SNAP households, retailer and consumer confusion, and the project's evaluation measures." Despite these comments, USDA deemed them insignificant and allowed the North Dakota waiver to proceed without modification.

**Ohio Food Restriction Waiver**

154. Ohio participates in SNAP. The Ohio Department of Job and Family Services ("Ohio DJFS") is solely responsible for administering SNAP in Ohio. Ohio Rev. Code Ann. § 5101.54 (West 2026).

155. On October 28, 2025, Ohio DJFS submitted a request for approval of a demonstration project via the template form provided by USDA.

156. USDA approved the demonstration project ("Ohio waiver") on March 4, 2026.

157. Specifically, the Ohio waiver authorizes Ohio DJFS to prohibit the use of SNAP benefits for the purchase of "sugar-sweetened beverages."

158. The designated start date for the Ohio waiver is April 1, 2027.

**Oklahoma Food Restriction Waiver**

159. Oklahoma participates in SNAP. The Oklahoma Department of Human Services ("Oklahoma DHS") is solely responsible for administering SNAP in Oklahoma. Okla. Stat. tit. 56, § 241 (2025).

160. On June 6, 2025, Oklahoma DHS submitted a request for approval of a demonstration project via the template form provided by USDA.

161. USDA approved the demonstration project ("Oklahoma waiver") on August 4, 2025.

162. On September 25, 2025, Oklahoma DHS submitted a request to USDA to modify the definitions of "candy" and "soft drinks" in the approved Oklahoma waiver. On November 17, 2025, Oklahoma DHS submitted a request to USDA to change the Oklahoma waiver implementation date from January 1, 2026 to February 15, 2026. On December 12, 2025, USDA approved both requested modifications.

163. Specifically, the Oklahoma waiver authorizes Oklahoma DHS to prohibit the use of SNAP benefits for the purchase of "candy" and "soft drinks."

164. The Oklahoma waiver went into effect on February 15, 2026, before USDA's belated requests for comment.

165. Plaintiff Morgan, an Oklahoma SNAP recipient, was not given the opportunity to comment on the Oklahoma waiver before it went into effect. Plaintiff Morgan would have commented before the waiver went into effect if given the opportunity, and submitted a comment opposing the waiver during the recent belated comment period.

**South Carolina Food Restriction Waiver**

166. South Carolina participates in SNAP. The South Carolina Department of Social Services ("South Carolina DSS") is solely responsible for administering SNAP in South Carolina. S.C. Code Ann. Regs. 114-2710 (1997).

167. On September 23, 2025, South Carolina DSS submitted a request for approval of a demonstration project via the template form provided by USDA.

168. USDA approved the demonstration project ("South Carolina waiver") on December 10, 2025.

169. On July 23, 2026, South Carolina DSS submitted a request to USDA to modify the definition of "soft drinks" in the approved South Carolina waiver. On August 3, 2026, USDA approved the requested modification.

170. Specifically, the South Carolina waiver authorizes South Carolina DSS to prohibit the use of SNAP benefits for the purchase of "candy, energy drinks, soft drinks, and sweetened beverages."

171. The South Carolina waiver went into effect on November 1, 2026.

172. Following the conclusion of the comment period on the South Carolina waiver, USDA published a notice in the Federal Register acknowledging that "[m]ost commenters opposed the project, citing concerns about potential health and nutrition impacts, limits on participant choice, added burden on SNAP households, retailer and consumer confusion, and the project's evaluation measures." The comments opposing the waiver included a submission from SCCPMA that described its members' concerns with the waiver. Despite these comments, USDA deemed them insignificant and allowed the South Carolina waiver to proceed without modification.

**Texas Food Restriction Waiver**

173. Texas participates in SNAP. The Texas Department of Health and Human Services ("Texas HHS") is the single state agency responsible for administering SNAP in Texas. 1 Tex. Admin. Code § 372.6 (2026).

174. On June 26, 2025, Texas HHS submitted a request for approval of a demonstration project via the template form provided by USDA.

175. USDA approved the demonstration project ("Texas waiver") on August 4, 2025.

176. Specifically, the Texas waiver authorizes Texas HHS to prohibit the use of SNAP benefits for the purchase of "sweetened drinks" and "candy."

177. The Texas waiver went into effect on April 1, 2026, before USDA's belated requests for comment.

178. Plaintiffs Martin, Nasakaitis, and Salinas, all Texas SNAP recipients, were not given the opportunity to comment on the Texas waiver before it went into effect. All three of these Plaintiffs would have commented before the waiver went into effect if given the opportunity.

**Utah Food Restriction Waiver**

179. Utah participates in SNAP. The Utah Department of Workforce Services ("Utah DWS") is the single state agency responsible for administering SNAP in Utah. Utah Code § 35A-3-103 (2026).

180. On May 16, 2025, Utah DWS submitted a request for approval of a demonstration project.

181. USDA approved the demonstration project ("Utah waiver") on June 10, 2025.

182. Specifically, the Utah waiver authorizes Utah DWS to prohibit the use of SNAP benefits for the purchase of "soft drinks."

183. The Utah waiver went into effect on January 1, 2026, before USDA's belated request for comment.

**Virginia Food Restriction Waiver**

184. Virginia participates in SNAP. The Virginia Department of Social Services ("Virginia DSS") is the single state agency responsible for administering SNAP in Virginia. Va. Code Ann. § 63.2-801 (2025).

185. On November 4, 2025, Virginia DSS submitted a request for approval of a demonstration project via the template form provided by USDA.

186. USDA approved the demonstration project ("Virginia waiver") on December 10, 2025.

187. Specifically, the Virginia waiver authorizes Virginia DSS to prohibit the use of SNAP benefits for the purchase of "sweetened beverages."

188. The Virginia waiver went into effect on November 1, 2026.

189. Following the conclusion of the comment period on the Virginia waiver, USDA published a notice in the Federal Register acknowledging that "[m]ost commenters opposed the project, citing concerns about potential health and nutrition impacts, limits on participant choice, added burden on SNAP households, retailer and consumer confusion, and the project's evaluation measures." Despite these comments, USDA deemed them insignificant and allowed the Virginia waiver to proceed without modification.

**Wyoming Food Restriction Waiver**

190. Wyoming participates in SNAP. The Wyoming Department of Family Services ("Wyoming DFS") is the single state agency responsible for administering SNAP in Wyoming. Wyo. Stat. Ann. § 42-2-103 (2025).

191. On January 7, 2026, Wyoming DFS submitted a request for approval of a demonstration project via the template form provided by USDA.

192. USDA approved the demonstration project ("Wyoming waiver") on March 4, 2026.

193. Specifically, the Wyoming waiver authorizes Wyoming DFS to prohibit the use of SNAP benefits for the purchase of "sweetened, carbonated beverages."

194. The designated start date for the Wyoming waiver is February 1, 2027.

**Impact of the Food Restriction Waivers on SNAP Recipients**

195. The challenged waivers deprive every SNAP recipient in the waiver States, including the SNAP Recipient Plaintiffs and the proposed class members, of the full use of their SNAP benefits to purchase food that remains eligible under the federal definition of "food."

196. The SNAP Recipient Plaintiffs are individuals and families with limited incomes and resources who rely on SNAP benefits to obtain groceries. In most cases, SNAP Recipient Plaintiffs have no practical ability to replace lost SNAP purchasing power with cash. According to the public comment of a SNAP recipient in North Dakota, "SNAP benefits are already limited and rarely cover a household's entire food budget for the month. . . . Restricting what can be bought with EBT will only increase the financial strain of low-income families, forcing us to use even more of our extremely limited cash on everyday food items."[3]

---

[3] Anonymous, FNA-2026-0307-0006.

197. Because of the waivers, SNAP recipients are, or will be, forced either to forgo those items or to divert scarce funds away from rent, utilities, transportation, and other basic necessities to buy food. For example, Plaintiff Meyer's health has already deteriorated living under Idaho's waiver because she cannot buy the foods and beverages she needs.

198. The challenged waivers prohibit SNAP recipients from using their benefits to purchase entire categories of food and beverages on which they rely. To make matters worse, because none of the challenged waivers makes a list of excluded items readily available to SNAP recipients, recipients must guess, at the point of sale, whether a product will be accepted. For example, Plaintiff Wagner was mocked at the cash register for making a mistake about what she could buy under North Dakota's waiver. Plaintiffs Martin, Salinas, McRae, and Fitzpatrick also all struggle to determine which products they can use their SNAP benefits to purchase under their respective States' waivers.

199. SNAP recipients described these precise impacts in public comments. In one comment, a South Carolina SNAP recipient describes how the waiver will impact their ability to parent three young children and manage their home: "I deal with insomnia. My sleep quality is poor and I do drink energy drinks to continue through the long days of cooking, cleaning, raising 3 children, homeschooling, household shopping, chores ect.. [sic] . . . I feel that these waivers are taking away not only my freedom to make my own healthy decisions for my own body but also the waivers will impact us in harmful ways."[4] In another, an Idaho SNAP recipient explains the "practical problem" the waiver creates at checkout: "A SNAP recipient may place an item in the cart believing it is eligible and only discover at the register that SNAP will not pay for it. That can result in confusion, delays, embarrassment, and unexpected out-of-

[4] Anonymous, FNA-2026-0311-0006.

pocket costs for households that may have very little cash available."[5] A South Carolina SNAP recipient further explains the issues the waivers' broad and ambiguous definitions create at checkout: "Terms such as 'soft drinks' and 'sweetened beverages' may cover many different products, and shoppers may not always know whether a particular beverage is SNAP eligible until the transaction is processed."[6]

200. Because most of the waivers contain imprecise, confusing definitions of restricted categories, SNAP recipients in waiver States risk being denied the use of their SNAP benefits for products that should be permitted. Plaintiff Martin was once denied the ability to purchase any beverage except water with her SNAP benefits, even though that is a much broader prohibition than the Texas waiver imposes, and she has experienced inconsistency from store to store with regard to which products she can purchase. Plaintiff Nasakaitis has been turned away when trying to buy juice and muffins—both allowable items under the Texas waiver—with his SNAP benefits. Plaintiff Valdes was told by a store clerk that he could not purchase vanilla pudding and juice, even though both of these items are allowed under Florida's waiver. Plaintiff McRae had to use funds meant for other household expenses to buy non-dairy cheese, which should be purchasable with SNAP under Idaho's waiver, when a store clerk barred her from using her SNAP benefits to purchase such cheese. Plaintiff Morgan was stopped by a store clerk from purchasing items allowed under Oklahoma's waiver, including plain bottled water and unsweetened tea.

201. The participation of retailers is an essential component of SNAP, because SNAP recipients, including the SNAP Recipient Plaintiffs and all proposed class members, can only

---

[5] Anonymous, FNA-2026-0301-0010.
[6] Anonymous, FNA-2026-0311-0007.

utilize their benefits if retailers accept SNAP benefits as payment. SNAP program burdens that drive retailers out of SNAP, or that force them to be over-inclusive in the products they restrict to avoid penalties, discussed *infra*, are burdens that ultimately harm recipients. An anti-hunger organization explains this impact in a public comment: "[R]etailers could lose their SNAP retail status if they make mistakes and allow wrongful items to be paid for with SNAP EBT cards, raising the risk of reducing the supply of SNAP-authorized retailers and creating more food deserts. The proposed waiver will particularly harm people with disabilities, single mothers, military families, college students, and other SNAP recipients."[7] SCCPMA also submitted comments to communicate the same anticipated impact, stating that "the operational challenges for SNAP retailers, as well as the prospect of significant confusion, frustration and anger for our SNAP customers far outweigh the stated goals" of the waiver.[8]

202. Retailers have provided public comments across a variety of States articulating their serious concerns with the waivers' potential impact on their continued ability to accept SNAP. The Florida Retail Federation explained, "Inconsistent definitions among states can result in different eligibility determinations for similar products across state lines, making the program more difficult for SNAP participants to understand and retailers to administer."[9] In Missouri, Casey's General Stores, Inc. wrote, "While Casey's supports efforts to improve public health and nutrition, we are concerned that state-specific SNAP restrictions create significant administrative burdens for retailers, increasing compliance costs, and potentially reducing food

[7] MAZON: A Jewish Response to Hunger, FNA-2026-0311-0048.
[8] SCCPMA, FNA-2026-0311-0039.
[9] Florida Retail Federation, FNA-2026-0299-0028.

access in the communities SNAP is intended to serve."[10] These comments are only a small sample of the comments retailers and advocacy groups submitted across the country.[11]

**Class Allegations**

203. The proposed classes consist of:

> **Food Restriction Class:** All individuals who, since January 1, 2025, have received or will receive SNAP benefits in a State for which USDA approved, pursuant to 7 U.S.C. § 2026(b), a food restriction waiver altering the definition of "food" in 7 U.S.C. § 2012(k).

> **Notice and Comment Class:** All members of the Food Restriction Class who receive SNAP benefits in a State whose food restriction waiver went into effect before USDA completed the notice-and-comment process required by 7 C.F.R. § 282.1(b).

204. Plaintiffs seek certification of the Food Restriction Class and the Notice and Comment Class under Federal Rules of Civil Procedure 23(a) and 23(b)(2). Membership is determined by two objective facts—receipt of SNAP benefits and the State in which those benefits are received—and does not depend on any member's medical needs, dietary preferences, purchasing history, or the merits of any claim.

205. Each class is so numerous that joinder of all members is impracticable.

---

[10] Casey's General Stores, Inc., FNA-2026-0305-0033.

[11] *See also* California Food Banks, FNA-2026-0298-0010 (noting the substantial burden on vendors that may force many, and especially smaller shops, to consider ending their participation in SNAP EBT); National Grocers Association, FNA-2026-0299-0032 (differing definitions of products across state lines will cause confusion for SNAP retailers); FMI- The Food Industry Association, FNA-2026-0300-0015 (state-specific SNAP restrictions will create significant implementation challenges for online grocery sales); RaceTrac, Inc., FNA-2026-0302-0032 (when part of a [SNAP user's] purchase is declined, the result is rarely a healthier choice but rather an abandoned basket or an additional trip to another store); SNAC International, FNA-2026-0306-0012 ("Without a clear and nationally consistent definition, states may interpret the category differently or reach different conclusions regarding products that are nutritionally or functionally similar").

206. The Classes each contain millions of persons. As of October 2026, more than 11 million individuals participated in SNAP in the eighteen States with currently approved waivers. Class members are dispersed across at least eighteen States and, by definition, have limited incomes and resources, making individual suits impracticable.

207. There are questions of law common to the Classes, the answers to which will resolve the claims of every Class member in one stroke, including:

a. As to the Food Restriction Class, whether projects designed to improve the diet, health, or nutrition of SNAP recipients, such as the food restriction waivers at issue in this case, may be approved, if at all, only under 7 U.S.C. § 2026(k), such that USDA exceeded its statutory authority by approving every challenged waiver under Section 2026(b);

b. In the alternative as to the Food Restriction Class, whether the food restriction waivers fail to satisfy Section 2026(b) because they are not pilot or experimental projects designed to test program changes that increase the efficiency of SNAP or improve the delivery of benefits, do not serve any of the four permissible purposes of Section 2026(b)(1)(B)(ii), and lack the evaluation method required by Section 2026(b)(1)(B)(i)(II);

c. As to the Food Restriction Class, whether USDA's uniform failure to acknowledge or explain its reversal from its 2018 rejection of materially identical restrictions renders every challenged waiver approval arbitrary and capricious;

d. As to the Food Restriction Class, whether USDA's uniform failure to consider the permissible purposes listed in 7 U.S.C. § 2026(b) renders every challenged waiver approval arbitrary and capricious; and

e. As to the Notice and Comment Class, whether USDA violated 7 C.F.R. § 282.1(b) and the APA by implementing waivers before providing the required notice and opportunity to comment, pursuant to a single Notice-and-Comment Determination made for every waiver, and whether USDA's belated post-*Aragon* requests for comment can cure that violation.

208. None of these questions turns on any Class member's individual circumstances or on the specific products each State restricts. Each question turns solely on USDA's own conduct, which was uniform across every challenged waiver. The rights of all members of the Classes will be vindicated if the Court sets aside USDA's approval of the waivers.

209. The Named Plaintiffs' claims are typical of the claims of the Classes they seek to represent. Each Named Plaintiff is a SNAP recipient in a waiver State who is subject to the same unlawful waiver-approval initiative, suffers the same injury—the loss of full use of SNAP benefits—and advances the same legal theories as every member of the relevant Class.

210. Defendants have acted on grounds that apply generally to each Class, so that final injunctive and declaratory relief is appropriate respecting each Class as a whole. Plaintiffs seek no damages and no individualized relief; a single order vacating the challenged approvals and enjoining future approvals and implementations would provide relief to every Class member, regardless of the State in which the member resides or the products that State restricts.

211. The Named Plaintiffs serving as class representatives will fairly and adequately protect the interests of the Classes. They have no interests antagonistic to those of absent Class members, and they seek the same relief.

212. The Named Plaintiffs have retained counsel experienced in public benefits and class action litigation.

213. The National Center for Law and Economic Justice has litigated numerous cases seeking to protect full access to SNAP in federal district courts throughout the country, including through class action.

214. Shinder Cantor Lerner LLP is a law firm with a class action practice that has extensive experience litigating complex class actions.

215. Class counsel successfully litigated the *Aragon* case before the United States District Court for the District of Columbia concerning nearly identical SNAP food restriction waivers earlier this year.

**Impact on Plaintiff SCCPMA**

216. SCCPMA brings this action on behalf of its members. SCCPMA members that accept SNAP would have standing to sue in their own right because each is directly regulated by, and must bear the costs of complying with, the South Carolina waiver and the USDA Guidance. The interests SCCPMA seeks to protect—its members' ability to participate in SNAP free of unlawful product restrictions—are germane to SCCPMA's purpose of promoting the interests and welfare of its members. And because Plaintiffs seek only declaratory and injunctive relief that will inure to the benefit of all affected SCCPMA members, neither the claims asserted nor the relief requested requires the participation of individual members.

217. Many of SCCPMA's members are SNAP retailers. As of November 1, 2026, all SCCPMA members that accept SNAP became subject to South Carolina's waiver. They will become subject to USDA enforcement of the waiver on January 29, 2027.

218. Some SCCPMA members that accept SNAP operate in multiple States with approved food restriction waivers. Retailers must comply with the respective food restriction waivers in every State in which they operate.

219. SCCPMA opposed SNAP food restrictions in South Carolina when restrictions were considered by the South Carolina state legislature.

220. SCCPMA submitted comments to USDA opposing the South Carolina waiver, stating that "the operational challenges for SNAP retailers, as well as the prospect of significant confusion, frustration and anger for our SNAP customers far outweigh the stated goals" of the waiver. Some of SCCPMA's members also submitted comments to USDA opposing the South Carolina waiver, highlighting the upfront and ongoing burdens they will face implementing and complying with the waiver and the impact on the communities they serve if they were to lose their status as SNAP retailers. The comments submitted by SCCPMA and its members were deemed insignificant by USDA.

221. Compliance with the South Carolina waiver is burdensome to SCCPMA members that accept SNAP. A 2025 study commissioned by national food retailer trade groups estimated that SNAP food restrictions would impose up-front compliance costs of approximately $1.558 billion on food retailers nationwide, roughly $1.0 billion of which would fall on convenience stores, and ongoing compliance costs of more than $759.1 million per year.

222. One corporation whose wholly owned subsidiary is an SCCPMA member explained in its comments on the South Carolina waiver that preparation for waiver

implementation requires "a cross-functional team drawn from merchandising, IT, legal, and operations that reviewed every food and beverage item we sell against each state's definitions, built new eligibility rules into our point-of-sale system, and trained store teams to explain the changes to customers."[12] An SCCPMA member found that preparing for and complying with the South Carolina waiver "effectively adds a full-time position."[13]

223. To comply with the food restriction waivers, SCCPMA members that accept SNAP must ensure that they do not accept SNAP benefits for products disallowed by the applicable waiver. In practice, this means each product a retailer sells must be evaluated to determine whether it may be purchased with SNAP benefits in a waiver State. This designation process requires significant upfront work when a store makes initial allowability determinations.

224. The designation process also involves significant ongoing work when new products and new or special-edition versions of existing products must also be designated as allowable or not allowable for SNAP. This ongoing work is extremely burdensome because new products or special-edition versions of products are introduced frequently, and thus, retailers that accept SNAP face continuing compliance obligations that are burdensome and costly. As an SCCPMA member noted in its comment on the South Carolina waiver, "[f]lavors, sizes, and reformulations change without notice, so item lists quickly become outdated."[14]

225. According to an estimate included by a corporation whose wholly owned subsidiary is an SCCPMA member in its comment on the South Carolina waiver, there are more than 650,000 food and beverage products on the market, and approximately 20,000 new

---

[12] RaceTrac, Inc., FNA-2026-0311-0051.
[13] The Spinx Company, Inc., FNA-2026-0311-0023.
[14] *Id.*

products are introduced each year.[15] SCCPMA's members that accept SNAP must make designations as to all of them, in each waiver State in which they operate.

226. An SCCPMA member reviewed and made judgment calls on approximately 12,700 Universal Product Codes ("UPCs") in advance of the implementation of the South Carolina waiver.[16]

227. SCCPMA described these burdens in its comments opposing the South Carolina waiver, and members described these burdens in their own comments. A corporation whose wholly owned subsidiary is a member noted that "[m]any products could not be placed on either side of the line," and that "[p]rivate label and locally sourced items pose a distinct problem because they do not appear on any third-party UPC list."[17]

228. SCCPMA members that accept SNAP also must modify their Point of Sale ("POS") systems to comply with food restriction waivers. Many retailers use UPCs to track and identify products for sale, and waiver compliance requires designating UPCs as allowable or not allowable for SNAP.

229. SCCPMA's members described these burdens in their comments. A corporation whose wholly owned subsidiary is a member described making "changes in point-of-sale systems and software," and "engag[ing] third-party UPC classification services to review products and help ensure compliance."[18]

---

[15] RaceTrac, Inc., FNA-2026-0311-0051.
[16] The Spinx Company, Inc., FNA-2026-0311-0023.
[17] RaceTrac, Inc., FNA-2026-0311-0051.
[18] *Id.*

230. A member which operates in both South Carolina and North Carolina noted that it must now maintain three separate price books—one for North Carolina, one for SNAP-eligible items in South Carolina, and one for SNAP-ineligible items in South Carolina.[19]

231. SCCPMA members that accept SNAP include small retailers that do not have sophisticated POS systems. For these members, ongoing compliance will be even more burdensome, since implementation of the restrictions cannot be automated.

232. SCCPMA members that accept SNAP must pay high personnel costs associated with retailer waiver compliance. Retailer staff must be retrained, and conduct ongoing tasks related to ensuring waiver compliance.

233. For example, frontline retail workers bear the practical, day-to-day burden of implementing the waivers. When a SNAP recipient attempts to buy a product that is not allowable in that State, it falls to a cashier to explain that the product cannot be purchased, placing retail workers in the position of enacting and enforcing the waivers on SNAP recipients.

234. SCCPMA's members described these burdens in their comments. One member raised concerns that the South Carolina waiver will lead to "longer lines and friction at the register" and stated that frontline store staff will be "left explaining unclear rules to customers in areas outside their expertise."[20]

235. South Carolina has not provided a list of products that are not allowable under the waiver, and has provided minimal guidance for retailers. SCCPMA has requested additional clarity from South Carolina, but the state has declined to provide it. The South Carolina waiver does not require the state to provide additional guidance.

---

[19] The Spinx Company, Inc., FNA-2026-0311-0023.
[20] *Id.*

236. SCCPMA members that accept SNAP must therefore make their own assessments of which products are prohibited, and because of the significant ambiguities in the waiver's definitions, absolute compliance will be impossible for most retailers.

237. In comments on the South Carolina waiver, one SCCPMA member highlighted that "[t]erms such as 'sweetened beverage,' 'Gum & Mint,' and 'candy' are difficult to apply to actual products on the shelf."[21]

238. The USDA Guidance will add further onerous compliance burdens on SCCPMA members that accept SNAP, while threatening severe consequences for even minor noncompliance.

239. As soon as USDA commences enforcement of South Carolina's waiver, SCCPMA members that accept SNAP will be subject to loss of their SNAP retailer status on the basis of minor, isolated mistakes. As noted, if that happens it could take years for the SCCPMA member to regain status as a SNAP-accepting retailer.

240. Given that accepting SNAP is important to many SCCPMA members, for both business and community relations purposes, this threat is a significant concern to them. One way to avoid this outcome is to err on the side of restricting purchases with SNAP, which, as detailed above, SNAP Recipient Plaintiffs in other waiver States have already experienced when they were barred from purchasing certain allowable items with SNAP.

241. The compliance and enforcement burdens faced by SCCPMA members that accept SNAP materially increase the likelihood that they will be forced out of the program, whether because compliance costs are too great or by way of involuntary withdrawal. SCCPMA described the waivers' anticipated impact on its members in a comment, writing, "[t]he burdens

[21] *Id.*

of complying with the food restrictions put our members at risk of losing their status as SNAP retailers, whether due to enforcement actions by the USDA if retailers make mistakes in implementing the waiver, or due to being forced out of the program if compliance burdens become untenable."[22] As a corporation whose wholly owned subsidiary is an SCCPMA member noted in its comment on the South Carolina waiver, ambiguities in definitions make "occasional discrepancies at the register . . . unavoidable," and "[t]he two-strike enforcement structure . . . does not distinguish between a retailer acting in good faith and one deliberately circumventing the rules."[23] A member also raised a concern that retailers "face compliance risk for good-faith interpretation of unclear rules."[24]

**COUNT ONE: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (ACTION IN VIOLATION OF STATUTORY AUTHORITY)**

242. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

243. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

244. USDA exceeded its statutory authority in approving the food restriction waivers under 7 U.S.C. § 2026(b) because projects designed to improve the diet, health, or nutrition of SNAP recipients may be approved, if at all, only under 7 U.S.C. § 2026(k). In the alternative, USDA exceeded its statutory authority because the waivers do not satisfy Section 2026(b): they are not designed to test program changes that increase the efficiency of SNAP or improve the

---

[22] SCCPMA, FNA-2026-0311-0039.
[23] RaceTrac, Inc., FNA-2026-0311-0051.
[24] The Spinx Company, Inc., FNA-2026-0311-0023.

delivery of benefits, and they do not serve any of the four allowable purposes listed in the statute.

245. USDA further exceeded its statutory authority by approving the food restriction waivers under 7 U.S.C. § 2026(b) without any evaluation method capable of determining the effects of the project.

246. Approval of the food restriction waivers should thus be set aside.

**COUNT TWO: VIOLATION OF ADMINISTRATIVE PROCEDURE ACT (ARBITRARY AND CAPRICIOUS AGENCY ACTION)**

247. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

248. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

249. The food restriction waivers do not comply with basic statutory requirements. They are not "designed to test program changes that might increase the efficiency of [SNAP] and improve the delivery of [SNAP] benefits to eligible households." 7 U.S.C. § 2026(b)(1).

250. In approving the food restriction waivers, Defendants relied on a factor Congress did not intend them to consider under Section 2026(b): the waivers' anticipated effect on recipients' health and nutrition, which Congress addressed separately in Section 2026(k). *See supra* ¶¶ 52–59. Defendants also failed to acknowledge or explain their change in agency position.

251. In particular, USDA failed to acknowledge, let alone explain, its reversal from its own 2018 conclusion that materially identical restrictions would increase administrative costs, burden retailers, and restrict household food choices without demonstrated health benefits.

Having reached the opposite conclusion in every waiver approval challenged here, USDA was required to display awareness that it was changing position and to provide a reasoned explanation for the change. It did neither. That failure is common to every challenged waiver, because it inheres in USDA's own conduct rather than in any state-specific waiver term.

252. USDA further failed to consider whether the waivers satisfy the permissible purposes listed in Section 2026(b). This failure is likewise common to every challenged waiver, because it also inheres in USDA's own conduct rather than in any state-specific waiver term.

253. USDA is failing to consider issues central to the waivers that have been raised in comments submitted as part of the 7 C.F.R. § 282.1(b) notice and comment process before waiver implementation.

254. The approvals of the food restriction waivers were arbitrary and capricious, an abuse of discretion, and were not in accordance with the law.

255. Approval of the food restriction waivers should thus be set aside.

**COUNT THREE: ABSENCE OF NOTICE AND OPPORTUNITY TO COMMENT, A PROCEDURE REQUIRED BY LAW (ON BEHALF OF THE NOTICE AND COMMENT CLASS)**

256. Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

257. The Administrative Procedure Act provides that a reviewing court may "hold unlawful and set aside" agency actions that are made "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

258. USDA may not implement a SNAP demonstration project that will likely have a significant impact on the public under 7 U.S.C. § 2026 without first according the public notice of, and an opportunity to comment upon, a proposed project. 7 C.F.R. § 282.1(b).

259. USDA did not observe this notice-and-comment requirement before implementing the food restriction waivers for Arkansas, Florida, Idaho, Indiana, Louisiana, Oklahoma, Texas, and Utah.

260. USDA did not assess the applicability of this requirement on a waiver-by-waiver basis. Rather, USDA determined once, in a single informational memorandum applicable to the food restriction waiver initiative as a whole, that notice and comment was categorically unnecessary.

261. USDA's belated post-*Aragon* requests for comment do not cure this violation. As to the waivers USDA implemented before providing the required notice, implementation preceded any opportunity for public comment, rendering the comment process a nullity.

262. Members of the public, including Named Plaintiffs Martin, Nasakaitis, Salinas, Valdes, Roman, McRae, Meyer, and Morgan and members of the Notice and Comment Class, did not have any opportunity to comment before the food restriction waivers were implemented.

263. USDA's implementation of the Arkansas, Florida, Idaho, Indiana, Louisiana, Oklahoma, Texas, and Utah food restriction waivers, without observing the regulatory requirements for public notice and comment, was without observance of a procedure required by law.

264. Approval of the Arkansas, Florida, Idaho, Indiana, Louisiana, Oklahoma, Texas, and Utah food restriction waivers accordingly should be set aside.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this Court:

1. Certify the Food Restriction Class and the Notice and Comment Class under Federal Rules of Civil Procedure 23(a) and 23(b)(2), appoint the Named Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel under Rule 23(g);

2. Declare that Defendants' approval of the food restriction waivers violates the Administrative Procedure Act and the Food and Nutrition Act of 2008 in the respects set forth above;

3. Hold unlawful and vacate Defendants' approval of the food restriction waivers;

4. Permanently enjoin the continued application or enforcement of any challenged waiver that has already gone into effect;

5. Permanently enjoin the implementation of any challenged waiver that has not already gone into effect;

6. Permanently enjoin the approval or implementation of any future proposed food restriction waiver pursuant to 7 U.S.C. § 2026(b) for any State, including those States whose current waiver is enjoined or vacated in this action;

7. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

8. Grant such other relief as may be just and proper.

Dated: November 18, 2026
New York, New York

Respectfully submitted,

*/s/ Meegan Hollywood*

Meegan Hollywood (NY0206)
Jeffrey I. Shinder*
Ellison A. Snider*
Cynthia L. Murphy*
SHINDER CANTOR LERNER LLP
14 Pennsylvania Plaza, 19th Floor
New York, NY 10122
(646) 960-8601
meegan@scl-llp.com
jeffrey@scl-llp.com

esnider@scl-llp.com
cmurphy@scl-llp.com

Lindsay R. Maher*
SHINDER CANTOR LERNER LLP
600 14th Street NW, 5th Floor
Washington, D.C. 20005
(646) 960-8601
lmaher@scl-llp.com

Katharine Deabler-Meadows*
Ciara Malone*
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
deabler@nclej.org
malone@nclej.org

**Motion for Admission Pro Hac Vice forthcoming*